NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JONATHAN GALATZAN
California Bar No. 190414
Assistant United States Attorney
Asset Forfeiture Section
     Federal Courthouse, 14th Floor
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-2727
     Facsimile:  (213) 894-7177
     E-mail: Jonathan.Galatzan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>$213,694.00 IN U.S. CURRENCY, $108,526.76 SEIZED FROM TD AMERITRADE ACCOUNT NUMBER XXX-3394, $922,452.18 SEIZED FROM MORGAN STANLEY ACCOUNT XXX-0005, $116,103.94 SEIZED FROM MORGAN STANLEY CHOICE SELECT RETIREMENT ACCOUNT NUMBER XXX-1005, $150,527.00 SEIZED FROM CITY NATIONAL SECURITIES ACCOUNT NUMBER XXX-9974, ONE 2015 MERCEDES-BENZ S65V, ONE 2014 FERRARI CALIFORNIA, ONE 2010 FORD MUSTANG SHELBY CT600, ONE 2009 CIGARETTE 38' | NO. CV 18-3596<br><br>COMPLAINT FOR FORFEITURE<br><br>18 U.S.C. §§ 981(a)(1)(A) and (C) and 984<br><br>[F.B.I.] |

TOP GUN BOAT, ONE 2005 FERRARI )
F430, ONE 1991 FERRARI F40, AND )
ONE 1969 L88 CHEVROLET )
CORVETTE, )
                                )
          Defendants.           )
================================ )

    For its claims against defendants $213,694.00 in U.S.

Currency, $108,526.76 Seized From TD Ameritrade Account Number

XXX-3394, $922,452.18 Seized From Morgan Stanley Account Number

XXX-0005, $116,103.94 Seized From Morgan Stanley Choice Select

Retirement Account Number XXX-1005, $150,527.00 Seized From City

National Securities Account Number XXX-9974, One 2015 Mercedes-

Benz S65V, One 2014 Ferrari California, One 2010 Ford Mustang

Shelby CT600, One 2009 Cigarette 38' Top Gun Boat, One 2005

Ferrari F430, One 1991 Ferrari F40, and One 1969 L88 Chevrolet

Corvette (collectively, the "defendant assets"), plaintiff

United States of America alleges as follows:

<u>JURISDICTION AND VENUE</u>

    1.   This is a civil forfeiture action brought pursuant to

18 U.S.C. §§ 981(a)(1)(A) and (C) and 984.

    2.   This Court has jurisdiction over the matter under 28

U.S.C. §§ 1345 and 1355.

    3.   Venue lies in this district pursuant to 28 U.S.C.

§ 1395(b).

<u>PERSONS AND ENTITIES</u>

    4.   The plaintiff is the United States of America.

    5.   The defendants in this action consist of the

following:

i.   $213,694.00 in U.S. Currency seized during the execution of a federal search warrant from the residence of Richard Scott, located in Santa Monica, California[1] on November 8, 2017;

ii.  $108,526.76 In Funds Seized From One TD Ameritrade Account, which account is in the name of Richard and Rene Scott, has an account number with the last four digits ending in 3394[2] (the "TD Ameritrade 3394 Account") and the funds from which were seized pursuant to the execution of a federal seizure warrant at TD Ameritrade, 9757 Wilshire Blvd., Beverly Hills, California on November 9, 2017;

iii. $922,452.18 In Funds Seized From One Morgan Stanley Account, which account is in the name of Richard Scott, has an account number with the last four digits ending in 0005 (the "Morgan Stanley 0005 Account") and the funds from which were seized pursuant to the execution of a federal seizure warrant at Morgan Stanley, 282 Cabot Road, #500, Laguna Niguel, California on December 14, 2017;

iv.  $116,103.94 In Funds Seized From One Morgan Stanley Choice Select Retirement Account, which account is in the name of Richard Scott, has an account number with the last four digits ending in 1005 (the "Morgan Stanley 1005 Account") and the funds from which were seized pursuant to the execution

---

[1] Pursuant to Local Rule 5.2-1, only the city and state of residence addresses are set forth in this Complaint.

[2] Pursuant to Fed.R. Civ. P. 5.2(a)(4) and Local Rule 5.2-1, only the last four digits of financial account numbers are set forth in this Complaint.

of a federal seizure warrant at Morgan Stanley, 282 Cabot Road, #500, Laguna Niguel, California on December 14, 2017;

v.    $150,527.00 In Funds Seized From One City National Securities Account, which account is in the name of Richard Scott, has an account number with the last four digits ending in 9974 (the "CNS 9974 Account") and the funds from which were seized pursuant to the execution of a federal seizure warrant at City National Bank, 525 S. Flower Street, Los Angeles, California on November 14, 2017;

vi.   One 2015 Mercedes-Benz S65V, which vehicle has Vehicle Identification Number ("VIN") WDDUG7KB1FA100976, is registered to Richard Scott and was seized pursuant to the execution of a federal seizure warrant on November 8, 2017 from Richard Scott's Santa Monica, California, residence;

vii. One 2014 Ferrari California, which vehicle has VIN ZFF65TJA6E0195924, is registered to Richard Scott and Rene Scott and was seized pursuant to the execution of a federal seizure warrant on November 8, 2017 from Richard Scott's Santa Monica, California, residence;

viii.One 2010 Ford Mustang Shelby CT600, which vehicle has VIN 1ZVBP8KS6A5153369, is registered to Richard Scott and was seized pursuant to the execution of a federal seizure warrant on November 8, 2017 from Richard Scott's Santa Monica, California, residence;

ix.   One 2009 Cigarette 38' Top Gun Boat, which boat has Hull Identification Number CRTUST05L809, is registered to Richard Scott and was seized from its dock pursuant to the

4

execution of a federal seizure warrant in North Miami, Florida, on November 8, 2017;

       x.  One 2005 Ferrari F430, which vehicle has VIN ZFFEW58AX50141441, is registered to Richard Scott and was seized pursuant to the execution of a federal seizure warrant on November 8, 2017 from Richard Scott's Santa Monica, California, residence;

       xi.  One 1991 Ferrari F40, which vehicle has VIN ZFFMN34A2M0087589, is registered to Richard Scott and was seized pursuant to the execution of a federal seizure warrant on November 8, 2017 from Richard Scott's Santa Monica, California, residence; and

       xii. One 1969 L88 Chevrolet Corvette, which vehicle has VIN 194679S719392, is registered to Richard Scott and was seized pursuant to the execution of a federal seizure warrant on November 8, 2017 from Richard Scott's Santa Monica, California, residence.

Items 5 ii through 5 v are referred to collectively as the "defendant bank funds."

    6.    The defendant assets are in the custody of the United States Marshals Service in this District, except for defendant One 2009 Cigarette 38' Top Gun Boat which is in the custody of the United States Marshals Service in the Southern District of Florida where they shall remain subject to this Court's jurisdiction during the pendency of this action.

    7.    The interests of Richard Scott ("Scott"), Rene Scott ("R. Scott"), the U.S. Department of Veterans Affairs (the

"VA"), First Entertainment Credit Union, and TD Auto Finance LLC may be adversely affected by these proceedings.

## EVIDENCE SUPPORTING FORFEITURE

8.   In approximately 1999, Scott entered into a contract with the VA to operate parking lots on the campuses of the VA Greater Los Angeles Healthcare System ("VA GLAHS").  By 2002, a new contract was entered into that required Scott's business, Westside Services Limited Liability Company ("WSS"), to provide the VA with 60% of its gross revenue and to report annually on revenue collected and improvements and services provided by WSS in lieu of revenue payments ("The Contract").  Based on the investigation, the government determined that Scott maintained at least two sets of financial books, one of which he reported to the VA, which contained false revenue and expense statements, and a second, maintained by his bookkeeper/tax preparer, which contained actual expenditures.  During the course of The Contract, Scott underreported revenue to the VA by a minimum of $6,518,024 and over-reported expenses to the VA by a minimum of $8,344,309, which caused a fraud loss to the VA of at least $13,005,921.[3]  (This underreported revenue figure does not include all unreported cash, potentially totaling $1 million or more from parking at the Barrington Place Lot, UCLA baseball games, and other cash parking events.)  In addition, Scott began bribing the VA contracting official responsible for overseeing

---

[3] The fraud loss does not credit WSS with a $386,228 payment that was made by WSS to VA on or about December 12, 2016 after Scott was accused of fraud by the VA.

6

the contract in 2003 and continued to bribe him on a regular basis until the VA official abruptly retired in 2014 after Government investigators interviewed him.  Following the official's retirement, Scott continued making payments to the former VA official in order to continue to conspire against the VA and attempt to avoid termination of The Contract.

9.   As a result of the long-running scheme to defraud the VA, Scott amassed considerable wealth, including three condominiums in Santa Monica, California, each of which is valued at approximately $2,500,000, numerous high-end collectible cars, including three Ferraris, a Cigarette racing boat (docked in Miami, Florida), and brokerage accounts. Between 2003 and 2016, Scott also utilized WSS business bank accounts to pay for approximately $740,000 in travel, $413,000 in meals and entertainment, Scott's salary of $3.1 million, and countless personal expenses and owner's draws.

10.  The former VA contracting official began cooperating with the government in mid-May 2017, was interviewed multiple times, and agreed to record his conversations with Scott.  Among other things, the contracting official admitted to the bribery scheme, that the contracting officer knew Scott was underreporting revenue and inflating expenses reported to the VA, that Scott liked contractors that paid him in cash and frequently waited for cash parking events so that Scott could use the proceeds of that cash to pay the official.  The contracting official also admitted to law enforcement that prior to first meeting with the government in May 2017, he told Scott he was meeting with the government for a "reverse proffer."  In

surreptitiously recorded conversations later in May 2017, Scott told the official, among other things, that he (the official) never should have deposited cash (from the bribes) in his bank account, questioned how law enforcement knew "that it came from me?" and remarked that it was "Fucking seventy grand.  All this drama for seventy grand."  Later, after the official told Scott he might cooperate with the government, Scott complained that "you told me a hundred times, you weren't going to . . . rat out on me" and  "[i]f they only got you for one hundred thousand bucks what's the, that's nothing."

### *The Contract*

11.  On July 15, 2002, the VA and Scott entered into an agreement that was to commence on July 15, 2002 and expire on July 14, 2012.  The Contract required that 60 percent of all gross parking revenue of WSS be paid to the VA.  WSS was responsible for all expenses, which would be deducted from WSS' 40 percent share.  Payments and  settlement statements were required to be submitted quarterly, unless otherwise directed by the VA's contracting officer.

12.  On July 22, 2002, the VA and Scott modified The Contract.  The modification provided that WSS would provide parking management services on an as needed basis, including improvements to parking areas within VA GLAHS, and consulting and construction services related to the operation and management of parking at VA GLAHS.  Scott agreed to provide annual settlement statements.

13.  In a Memorandum for Record authored by the VA contracting officer being bribed by Scott, dated April 20, 2005,

the VA contracting officer documented that WSS allegedly
provided improvements and services in lieu of revenue to the VA
beginning in October 2003.  The Memorandum was approved by the
VA GLAHS Director.

### *Summary of Financial Analysis*

14.  WSS' actual gross revenue between 2003 and 2017 was at
least $27,092,830.43, not the $21,244,208.57 Scott reported to
VA.[4]  Since WSS was contractually obligated to provide 60 percent
of gross revenue to VA, the amount owed to VA for these years
was $16,255,698.26, which could have been paid by check or in-
kind services/improvements.

15.  According to the Settlement Statements provided by WSS
to the VA between 2003 and 2016, in-kind services/improvements
to VA parking lots totaled $11,651,032.15.  As WSS' total
ordinary expenses during that time period were $14,290,499.42,
WSS' statements meant that all but $2,639,467.27 of their
ordinary expenses were in-kind services/improvements for the VA.
In fact, WSS over-reported expenses by $8,344,309.98 and actual
in-kind services/improvements Scott provided to the VA only
totaled $3,306,722.17.[5]

16.  As stated above, the contract between WSS and the VA
stated the VA was entitled to 60 percent of the actual gross
parking revenue earned during the term of the contract, which
amounted to $16,255,698.26.  This amount was owed to VA in the
form of check or in-kind services/improvements.  From 2003 to

---

[4] WSS did not provide a 2017 Settlement Statement to the VA.

[5] In a December 17, 2015 letter, the VA informed Scott that
the VA would no longer accept in-kind consideration.

9

2017, actual in-kind services/improvements WSS provided in lieu of revenue totaled $3,306,722.17.  In addition, Scott made settlement payments to the VA of $344,696.48 during the term of The Contract.  As a result of the underreported revenue and over-stated in-kind services/improvements, the total fraud loss to the VA was at least $13,005,921.41.[6]

### Asset Tracing

17.    Between 2003 and 2017, Scott used five bank accounts to accumulate proceeds of the fraud, which were then used to fund or purchase additional assets described herein.  The five accounts were accounts at City National Bank with account numbers with the last four digits ending in 7279 ("WSS 7279") and 5203 ("WSS 5203"), at Wells Fargo Bank with account numbers with the last four digits ending in 5540 ("WSS 5540"), 3502 ("WSS 3502"), and 4853 ("WSS 4853").  Revenue earned by WSS was deposited into these five bank accounts and the VA was entitled under The Contract to 60 percent of the actual revenue that was deposited into these accounts. By not remitting the proper share of actual revenue to the VA, fraud proceeds remained within these five accounts.

### The Defendant $922,452.18 seized from Morgan Stanley Account 0005 represents fraud proceeds traceable to a WSS business bank account

18.    Morgan Stanley Account 0005 is held in the name of Scott and was opened on or about September 21, 2000.

---

[6] The fraud loss does not credit WSS with a $386,228 payment that was made by WSS to the VA on or about December 12, 2016 after Scott was accused of fraud by the VA.

19.  Check #1196, drawn on WSS 5203 in the amount of $135,000.00, was deposited into Morgan Stanley Account 0005 on or about November 24, 2003.

20.  Check #2566, drawn on WSS 7279 in the amount of $1,200,000.00, was deposited into Morgan Stanley Account 0005 on or about November 12, 2004.  This $1,200,000.00 deposit constituted the largest source of funding into Morgan Stanley Account 0005.  As of the time the funds were seized, there were no additional deposits into this account after this deposit.

21.  At the end of November 2004, Morgan Stanley Account 0005 contained at least $1,335,000.00 in funds from WSS, at least $994,255.69 of which represented funds that should have been paid to the VA, but were fraudulently withheld.  In addition, funds in Morgan Stanley Account 0005 were used to fund or acquire other assets.  The Defendant $922,452.18, seized by the Government, represents the fraud proceeds remaining in Morgan Stanley Account 0005 at the time the government seized the funds from that account.

***The Defendant $116,103.94 Seized From Morgan Stanley Account 1005 contains fraud proceeds traceable to Morgan Stanley Account 0005***

22.  Morgan Stanley Account #XXX-1005 is a Simplified Employee Pension Individual Retirement Account held in the name of Scott and opened on or about April 10, 2003.

23.  The account received two transfers from Morgan Stanley Account 0005 totaling $80,000.00, consisting of one transfer, on April 15, 2004, in the amount of $40,000.00, and a second transfer, on November 17, 2004, also in the amount of

$40,000.00.  In addition, on November 17, 2005, a check for $40,000.00, drawn on WSS 7279, was deposited into Morgan Stanley Account 1005. There have not been any additional deposits into Morgan Stanley Account 1005 since the $40,000.00 deposit on November 17, 2005.

24.   The Defendant $116,103.94, seized by the Government, represents the fraud proceeds remaining in Morgan Stanley Account 1005 at the time the government seized the funds from that account.

**The Defendant One 1991 Ferrari F40 was purchased with proceeds traceable to the fraud scheme**

25.   On or about January 17, 2015, Scott purchased the Defendant One 1991 Ferrari at an auction by making a down payment of $214,395.00 (paid via a check drawn on a City National Bank Account with an account number ending in 6612 ("CNB 6612")) while financing the remainder of the purchase price via a loan from Woodside Credit, which loan Woodside Credit thereafter sold to Bank of the Pacific.

26.   In addition, Scott repaid the loan with 26 checks drawn on Morgan Stanley Account 0005 totaling $128,360.00 (including $77,589.50 in payments made toward the principal balance due on the loan.)

**The Defendant One 2010 Ford Mustang Shelby CT600 was purchased with proceeds traceable to the fraud scheme**

27.   On or about January 20, 2013, Scott purchased the Defendant One 2010 Ford Shelby at an auction by making a down payment of $22,000.00 (paid via a check drawn on WSS 7279) while financing the remainder of the purchase price via a loan from

Woodside Credit, which loan Woodside Credit thereafter sold to Bank of the Pacific.

28.   In addition, Scott repaid the loan with 13 checks drawn on WSS 7279 totaling $14,000.00 (including $6,976.52 in payments made toward the principal balance due on the loan.) Scott paid off the loan on or about June 27, 2017 with a check drawn on Morgan Stanley Account 0005 in the amount of $20,000.00 (including $19,623.00 in payment toward the remaining principal balance due on the loan.)

***The Defendant One 1969 L88 Chevrolet Corvette was purchased with proceeds traceable to the fraud scheme***

29.   On or about April 19, 2011, Scott purchased the Defendant One 1969 L88 Chevrolet Corvette, financing the purchase via a loan from First Entertainment Credit Union ("FECU").  Scott repaid the loan with 48 checks drawn on WSS 7279 totaling $214,590.00 (including $195,089.71 in payments made toward the principal balance due on the loan.)

***The Defendant One 2015 Mercedes Benz S65V was purchased with proceeds traceable to the fraud scheme***

30.   On or about April 5, 2014, Scott purchased the Defendant One 2015 Mercedes-Benz S65V by making a down payment of $23,215.07 using his American Express credit card with an account number ending in 5005 ("AMEX 5004"), while financing the remainder of the purchase price via a loan from FECU.

31.   In addition, Scott repaid the loan with 31 checks drawn on WSS 7279 totaling $83,268.00 (including $71,312.73 in payments made toward the principal balance due on the loan) and paid his AMEX bill with funds drawn from WSS 7279.

*__The Defendant One 2005 Ferrari F430 was purchased with proceeds traceable to the fraud scheme__*

32.  On or about April 29, 2005, Scott purchased the Defendant One 2005 Ferrari F430 for $206,000.00 with a check drawn on WSS 7279.  The payment was for the entire purchase price of the vehicle.

*__The Defendant One 2014 Ferrari California was purchased with proceeds traceable to the fraud scheme__*

33.  On or about August 13, 2013, Scott purchased the Defendant One 2014 Ferrari California by making a down payment of $20,000 using AMEX 5004, while financing the remainder of the $234,000 purchase price via a loan from TD Auto Finance.

34.  In addition, Scott repaid the loan with at least one check drawn on Morgan Stanley Account 0005 totaling $5,000.00.

*__The Defendant One 2009 Cigarette 38' Top Gun Boat was purchased with proceeds traceable to the fraud scheme__*

35.  Scott purchased the Defendant One 38-foot Top Gun boat on August 12, 2013 via a personal check drawn on a Wells Fargo account with the last four digits ending in 0714 ("Wells Fargo Account 0714") for $25,000.00 and a September 5, 2013 electronic wire transfer from the same Wells Fargo account in the amount of $240,550.00.

36.  Deposits into Wells Fargo Account 0714 on or about the time the Top Gun boat was purchased were comprised primarily of rental payments from tenants living in properties in Malibu (the "Malibu House") and Santa Monica ("Santa Monica condo") owned by Scott, and a payment to Scott for the purchase of the furniture in the Malibu House.  These funds were then used to purchase the

14

Defendant One 38-foot Top Gun boat and are traceable to the fraud scheme for the reasons set forth below.

37.   Scott purchased the Malibu House in the first quarter of 2004 for an undisclosed amount via Chicago Title Company and Malibu Escrow.   Check #1258, drawn on WSS 5203 for $117,000.00, was payable to Malibu Escrow and cleared on or about January 14, 2004.   Checks drawn on WSS 7279 (and its predecessor account) were used to make mortgage payments of at least $400,000.00 toward the $3 million mortgage held by FECU during the time that Scott owned the Malibu House.

38.   Deposits to Wells Fargo Account 0714 in 2013 prior to the purchase of the Top Gun Boat included $60,000 from individuals to whom Scott was renting the Malibu House as well as a wire transfer in the amount of $450,000.00 on or about June 19, 2013 from the individual to whom Scott sold the Malibu House on or about July 3, 2013.   The $450,000.00 out of escrow payment was allegedly for furnishings located within the Malibu House. Between February, 2004, and July, 2013, the time frame in which Scott was the owner of the Malibu House, at least $68,000.00 was charged to Scott's American Express 5004 for furniture purchases.   AMEX 5004 was frequently paid with checks and ACH payments from WSS 7279 and appeared to function as the business credit card for WSS.

39.   Deposits into Wells Fargo Account 0714 between March 7, 2013 and September 5, 2013 also included six checks totaling $42,000.00 from an individual renting the Santa Monica Condo. Scott purchased the Santa Monica Condo on July 1, 2003 for $520,000.00.   Check #503, in the amount of $50,000.00 and drawn

on Morgan Stanley Account 0005 was payable to "BST Escrow" and cleared on or about March 3, 2003.  Scott financed the remainder of the purchase price via a loan for $416,000.00 from National Cooperative Bank ("NCB").  In addition, prior to September, 2013, Scott repaid the loan with over 100 checks drawn on WSS 7279 totaling approximately $331,925.00.

### The Defendant $150,527.00 Seized From City National Securities Account 9974 represents proceeds of the fraud scheme

40.  CNS Account 9974, held in Scott's name, was initially funded via a transfer of $200,000.00 on March 19, 2014 from Scott's CNB personal checking account CNB 6612, and $200,000.00 and $2,000.00 were transferred from CNB 6612 to CNS 9974 on August 27, 2014 and January 20, 2016, respectively.

41.  Pre March 19, 2014 deposits into CNB #6612 included a $60,000 transfer from WSS 7279, check deposits totaling $27,000 from WSS 3502, and check deposits totaling $26,345.53 from WSS 7279.  On August 26, 2014, $203,000 was transferred from WSS 7279 to CNB 6612 and, as mentioned above, $200,000 was transferred on August 27, 2014 to CNS 9974.

### The Defendant $108,526.76 Seized From TD Ameritrade Account 3394 represents proceeds of the fraud scheme

42.  TD Ameritrade Account 3394 is held in the name of Scott and his spouse.  On July 3, 2013, $1,375,671.69 was wire transferred from Malibu Escrow Corp. to TD Ameritrade Account 3394.  The payment details indicate "Further Credit to Rene Scott".  The wire transfer coincided with the closing date for the sale of the Malibu House which, as described in Paragraph 37 above, represented proceeds of the fraud scheme.  The Defendant

16

$108,526.76 in bank funds represent the fraud proceeds remaining in the account at the time the funds were seized by the Government.

### *The Defendant $213,694.00 in U.S. Currency represents proceeds of the fraud scheme*

43.  Between 2007 and 2017, only $269,985.00 in cash was deposited into the five previously-mentioned WSS bank accounts, which is a small percentage of the cash collected by WSS during this time period.

44.  WSS employees would hand-deliver cash parking revenue generated by the Barrington Place parking lot, directly to Scott.  One former employee of WSS estimated he personally delivered approximately $1,300 per week in cash from Barrington Place parking lot income to Scott, and estimated UCLA baseball parking generated approximately $300 during small games and $1,000-$2,000 during larger games.

45. According to the former VA contracting officer, Scott did not report income from construction and subcontractor parking in Lot 29.

46.  As described in Paragraph 8, Scott under reported or failed to report cash revenues, potentially totaling $1 million or more, from parking at the Barrington Place parking lot, UCLA baseball games, and other cash parking events.

47.  Additionally, as discussed above in paragraph 10, Scott told the VA contracting officer to whom he was giving cash bribes "Told you a hundred times, I told you, and I told you, and I told you, make sure you're not depositing this."  Scott was clearly concerned about illegal proceeds being deposited

into a bank account.  It is therefore unlikely that Scott would have deposited cash earned from WSS business that was not reported to VA into any bank account, as it would have created a financial trail that could be tracked by law enforcement.

48.  During the execution of the Federal search warrant at Scott's residence on November 8, 2017, agents found and seized the Defendant $213,694.00 and a money counting machine.

49.  On December 7, 2017, a Grand Jury in this District returned an Indictment against Richard Scott, in the case of *United States v. Richard Scott*, CR 17-00754-RGK, charging Scott with violating 18 U.S.C. §§ 371 (Conspiracy to Commit Bribery and Major Fraud Against the United States), 1031 (Major Fraud Against the United States), 1343 (Wire Fraud), 2314 (Interstate Transportation of Money Obtained by Fraud), and 2 (Aiding and Abetting and Causing an Act to be Done).

50.  Based on the above, plaintiff alleges that the defendant assets represent or are traceable to proceeds of one or more violations of 18 U.S.C. § 1343 (wire fraud), which is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B).  The defendant assets are therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).  To the extent that the defendant bank funds are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account as the property involved in the specified offense, rendering them subject to forfeiture pursuant to 18 U.S.C. § 984.

51.   Based on the above, Plaintiff alleges that the defendant assets constitute property involved in one or more transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i), or property traceable to such property, with the specified unlawful activity being violations of 18 U.S.C. § 1343 (wire fraud).  The defendant assets are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).  To the extent that the defendant bank funds are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account as the property involved in the specified offense, rendering them subject to forfeiture pursuant to 18 U.S.C. § 984.

52.   Based on the above, Plaintiff alleges that the defendant assets constitute property involved in one or more transactions in violation of 18 U.S.C. § 1957, or property traceable to such property, with the specified unlawful activity being violations of 18 U.S.C. § 1343 (wire fraud).  The defendant assets are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).  To the extent that the defendant bank funds are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account as the property involved in the specified offense, rendering them subject to forfeiture pursuant to 18 U.S.C. § 984.

WHEREFORE, plaintiff United States of America prays:

(a)  that due process issue to enforce the forfeiture of the defendant assets;

(b)  that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c)  that this Court decree forfeiture of the defendant assets to the United States of America for disposition according to law; and

(d)  for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

DATED: April 27, 2018       NICOLA T. HANNA
                            United States Attorney
                            LAWRENCE S. MIDDLETON
                            Assistant United States Attorney
                            Chief, Criminal Division
                            STEVEN R. WELK
                            Assistant United States Attorney
                            Chief, Asset Forfeiture Section


                            /s/ Jonathan Galatzan
                            JONATHAN GALATZAN
                            Assistant United States Attorney

                            Attorneys for Plaintiff
                            UNITED STATES OF AMERICA

VERIFICATION

I, Michael Torbic, hereby declare that:

1.    I am a Special Agent with the Federal Bureau of Investigation and I am the case agent for the forfeiture matter entitled <u>United States of America v. $213,694.00 in U.S. Currency, et al.</u>

2.    I have read the above Verified Complaint for Forfeiture and know its contents.   It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3.    Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed April___, 2018 in Los Angeles, California.


MICHAEL TORBIC
Special Agent-FBI